# CIRCUIT COURT NO. 2 OF BALTIMORE CITY

Filed April 14, 1927.

JAMES H. DOWNS, JR.,
VS.
AGNES W. DOWNS, AND CROSS-
BILL.

*O. Parker Baker* and *Linwood L. Clark* for complainant.

*William Purnell Hall* and *T. Howard Embert* for defendant.

STANTON, J.—

The evidence in this case records an effort of both parties to an unhappy marriage to free themselves from the bonds of matrimony, which link together two people who cannot charge their differences to inexperience in life. James H. Downs, Jr., the plaintiff, is fifty-two years of age, with a previous unfortunate marriage to his credit. The defendant, Agnes W. Downs, testifies that she is forty-three years of age and for the best part of her life has been engaged in business, which has been successful to the point of a comfortable living, and enabled her to accumulate some small estate.

The wife attributes a large part of the trouble between her and her husband to temperamental incompatibility on his part; and his refusal to provide for her support. In this latter complaint she is not without cause.

The husband has paid eight or ten dollars each week for table board for a period of about four months, during the six months they lived together in the property at Walbrook avenue and Cheston street. Mr. Downs was relying on the fact that by purchasing the home, and a quantity of coal which was then in the cellar, and being required to pay the taxes and water rent on the property, he could not be expected to pay a greater sum than was necessary to cover board for himself in the table expense.

He did not furnish his wife with clothes during their entire married life. Nor did he give her money for incidental personal expenses.

They were married on Thursday, August 16th, 1922, in Alexandria, Virginia. The following Sunday they went to Atlantic City in the wife's automobile, for a stay of two weeks. At his suggestion she turned over to her husband about $240 for safekeeping. She spent comparatively little, as she thought, but upon returning home he handed her about thirty or forty dollars, and said that was all that was left of her money. The husband testifies that he returned to her about $200 of the amount. Upon the return from Atlantic City, the husband went to the home of his father, where he was living at the time of his marriage. The

wife asked him if he was not going to her home, where she had her own room, and where they could live together. She understood that he intended to do so.

He never did occupy any living quarters with his wife, until he purchased the property at Walbrook avenue and Cheston street, which they occupied as a home some time about December 29th, or 30th, 1922. Except for a few articles purchased with the property, and one or two rugs, the wife furnished the home with her own furniture, having a home of her own at the time of the marriage. Her sister and brother went to live with them, and paid board. Mr. Downs testifies that on one occasion he told his wife he would knock her teeth down her throat if she laid her hands on him. Outside of this incident there was no evidence of violence or threatened violence by him. He is described as being "crabby" about the house, and at the table he would get up and walk around for the food, place it in front of his plate, and help himself. Mr. Downs appears to have taken a pride in fixing up the floors, and painting the woodwork in the house. Mr. Downs further testifies his wife would go to business each day, as he did. And although she attended to the marketing and running the home he says she was not a domestically inclined woman. He attributes to her one or two remarks made in the course of the home life, and while they were in their own bedroom, which are duly emphasized by the husband, and unqualifiedly denied by the wife. Nothing of moment transpired, until Mrs. Downs sold her business and remained at home, from about May 1st until June 27th, 1923, when the house was closed, and she left two or three days thereafter for Florida. Mr. Downs attended some social occasion where his wife was present the night before she left for Florida. The next day he was at the railroad station to see her off, and gave her some money towards paying for the ticket. He kissed her good-bye, and left her under the impression he would soon be down to see her. Mrs. Downs says he was to come down, and if she liked the place, he would get a position down there, and they would make their home in Florida. This he denies. But his letters show that he did contemplate and hoped to arrange a trip. Shortly after his wife left, he appears to have been

negotiating for a sale of the home. Indeed he had advertised it for sale while they were living in it. Just why, does not clearly appear in the evidence, except it be as the wife says, he began to complain of the size of the house, and the amount of taxes, and the cost of its upkeep. Mr. Downs says that it was understood between him and his wife, that she would continue in business, and repay to him the purchase price of the house. This the wife denies. Whatever the cause, he did mail a deed to her on July 13th, purporting to convey the property to one Steinmetz. The reported purchaser was associated in business with Mr. O. Parker Baker, who is and has long been the personal counsel of the father of Mr. Downs. From this time their personal relations began to assume an acute state. The wife did not sign and return the deed immediately. This occasioned another letter on July 23rd. The wife replied by telegram on July 25th, refusing to sign the deed. From this date the husband began a series of insulting letters. Some of the language was brutal and vicious. To have met his demands would have been at the price of self-respect, and lasting humiliation. No reasonable person could expect that a proposition of the husband to rent an apartment for the wife to return to Baltimore, so that she and her husband might resume housekeeping, could be accepted or successfully carried on, with such venom as was contained in his letters. The proposition did not carry sincerity. She was goaded into writing him on August 16th and September 17th that she had made up her mind definitely and emphatically that she would not sign the deed nor would she live with him again. This is the time from which the plaintiff claims the desertion began, although the bill of complaint declares it to be the date of her leaving for Florida about June 29th or 30th. Mrs. Downs enclosed a copy of the letter to her husband in a communication she sent to Mr. Embert, who was her Baltimore attorney. On September 23rd, Mr. Embert acting for Mrs. Downs, made a proposition of property settlement which was declined.

Bitter letters were written by Mr. Downs to his wife on September 6th, September 15th, September 25th and October 16th, and thereafter they ceased corresponding. In April or May, 1924, she returned to Baltimore, and

went to Mr. Baker's office in an effort to locate and communicate with her husband. Mr. Baker informed her that Mr. Downs was not in the city, but was in New Jersey, or some place outside of Maryland. Mrs. Downs went from Mr. Baker's office and walking up Howard street she met her husband. She stopped him, and proposed a conference looking to an adjustment of their differences, and re-establishing their home. He said he was going to Bay Shore the next day, and would take her down there with him, when they would talk over matters. He failed to do so. The wife wrote him several letters looking to a reconciliation, and telling him she had written her letters of August 16th and September 17th in anger, because of his charges against her. To all of these overtures he made no reply, and had no contact with her personally or by letter except through his solicitor, from May or June, 1924, until the bill of complaint was filed on December 16th, 1926.

It is difficult to appraise the measuse of sincerity and good faith of either the plaintiff or defendant in their suggestions to forget their differences, because each one has been under the advice of counsel since early in July, 1923. But it is perfectly clear that the plaintiff in the original bill has not shown a legal desertion on the part of the wife, unless it is regarded that her letters of August 16th and September 17th corroborate his testimony. However, when the correspondence is reviewed, and the harsh tones of his letters and the taunts which he purposely applied to her in asking the amount he must pay for his ransom are given effect, the wife is not to be held to the full weight of her language, and let the husband profit at her expense, and thereby accomplish the very end he deliberately sought; especially when it appears that the wife retracted what she had written, while the husband never has disclaimed any purpose to offend, but rather emphasizes his position by repeated insults since she first declined to accede to his demand that she sign the deed to the Walbrook avenue property, before he would even discuss any other phase of their differences with her.

It appears in the evidence that certain transfers of property which had stood in the name of Mrs. Downs, were executed by her during the time they were living together in one of which Mr. Downs was a party to the deed. She also had bank accounts, and a building association account, all of which were carrying in addition to the name of Mrs. Downs, the real owner, the name of her husband. It does not appear when these second names are placed on the accounts, but she gave explanations for all of these transactions. It is not necessary to determine her good faith in continuing them as she has. It is a fact that they have all aroused suspicion in the mind of Mr. Downs. But when the evidence under the cross bill is considered it cannot be said that there is satisfactory proof of a legal desertion on his part, unless his failure to accept her offer to return and live with him in May, 1924, is regarded as the beginning of desertion by him. If this is correct, the cross bill of the wife is prematurely filed, in praying for a divorce a vinculo on the ground of desertion.

That Mr. Downs has not adequately supported his wife, he does not deny, but attempts to excuse himself on the ground that his action in this respect was the result of an understanding that his wife would provide for herself. This statement the wife denies.

Mr. Downs wrote to his wife on September 15th, 1923, that he did not want her to release him, and he would not release her from the marriage bond. He wrote again in like tenor on October 16th, 1923.

The Court finds that both the husband and wife have contributed to the condition now existing in their married life. That neither the plaintiff in the original bill, nor the plaintiff in the cross bill has met the burden assumed by each one of showing the existence of abandonment or desertion of the character required to justify the Court in granting relief on these grounds. Kline vs. Kline, 146 Md. 27. Kane vs. Kane, Daily Record, March 26th, 1927.

This leaves for consideration the prayer of the original bill asking for the reformation of the deed of the Walbrook avenue property.

When Mr. Downs purchased this property the contract was executed in his name. The real estate agent, who negotiated the sale, made application to the Title Guarantee and Trust Co., to search the title. The application set forth the name of James H. Downs, Jr., as the purchaser, and the deed was made in his name as sole

grantee. The deed was signed and acknowledged by the grantors, and the purchase price was paid. The deed was left with the Title Co., to be recorded. When Mr. Downs saw his wife that evening, he told her that the transfer had been made. She inquired whether he had put her name in the deed as he had told her he intended to do. He replied no. After some discussion, in which Mr. Downs testifies that his wife said, "Well, you know I am going to place your name on my property," he told her he would go down to the Title Company and have them put her name in the deed. The wife denies that she ever said anything about putting his name on her property. The next morning he appeared in the Title Company's office and directed them to insert his wife's name in the deed as an additional grantee, which was done, and the necessary changes made in its language to cover a tenancy by the entireties. The insurance policy issued by the Title Company was also changed. The deed was recorded, and the recording ticket and the insurance policy were mailed to Mr. Downs on December 28th, 1922, and have been in his possession ever since. He had the fire insurance policy issued in both names. He represented to his wife in July, 1923, that he had sold the property, and requested her to sign and acknowledge the deed, so that he might make a transfer of the property. He now claims an alteration in a material part of the deed after its delivery, and without the assent of the grantors; or a reacknowledgment of the deed by the grantors.

It is not free from doubt that the original bill of complaint in this case is multifarious. In the case of Feigley vs. Feigley, 7 Md. 537, our Court of Appeals was dealing with an entirely different situation, but even then the Court emphasizes the face that the supplemental bill was received without objection. No demurrer was interposed in this case. But where the relief for setting aside a deed made in fraud of the rights of the wife is considered in a divorce proceeding, it is only incidental to the relief in granting divorce. If the divorce is denied, a fortiori, the incidental relief will be denied. In a case of this character jurisdiction of the original bill of complaint cannot be retained for the purpose of adjudicating on the rights of the parties in the deed. But if this were not true,

the bill of complaint would be dismissed as to the prayer for reformation of the deed for the following reasons:

When a husband directs a deed to be made in the name of himself and his wife, even though he pays all of the purchase price, he is regarded as having made a gift to the wife to the extent of her interest therein. In the instant case the husband ordered the change to be made, and it was done under his direction, with his full approval, and he has acquiesced in the transaction until differences arose between them. As late as July, 1923, he ratified his acts by negotiating a sale, and was ready to pass title to an innocent purchaser. But now that it suits his purpose, he undertakes to repudiate the transaction so as to invest title in himself, free from any claim of the wife, which he gave her by directing the change to be made.

In the case of Abbott vs. Abbott, 189 Ill. 488, which was a controversy between a husband and wife, the Court said: "If the change was made after the delivery of the deed to George B. Abbott, even with his consent, for the purpose of transferring the title to his daughter—Fern Abbott—it would be ineffectual for that purpose, and render the deed absolutely void as a transfer of title. *In that case, however, if George B. Abbott himself procured the change to be made he could not repudiate it afterwards and claim title in himself, notwithstanding the alteration*, and therefore to sustain his contention, that the title is still in him, he must have shown by proofs that such title vested in him by a delivery of the deed prior to the alteration *and that he did not make the change or consent that it should be made.*"

The solicitors for Mr. Downs contend that the case of John vs. Hatfield, 84 Indiana 72-82, is analogous to this case. The distinction is clear. In the Hatfield case the alteration by insertion of an additional grantee was made by the justice of the peace after delivery of the deed, *without the consent of the original grantee.* The original grantee protested and went at the time the alteration was made, and retained the deed from record in the pocket of her dress until her death. In this case the original grantee directed the name be inserted, and is said to have stated that it was a

Christmas gift to his wife. He ratified his act by having a deed prepared for her to sign in July, 1923. He has done nothing to repudiate his own acts until December, 1926, four years after the transaction was consummated. He made a gift to his wife which a Court of Equity will sustain and which cannot be set aside in the manner attempted in this proceeding.

The case of Krach vs. Carson decided by the Court of Appeals of Maryland, May 15th, 1926, and reported 133 Atl. Rep. 306, does not apply to the facts in this case.

For the foregoing reasons the original bill of complaint and the cross bill will be dismissed, plaintiff in the original bill to pay the costs. A decree will be signed accordingly.